IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN  DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO: 2:09cr85-MHT |
| | ) | |
| NICADEMUS JOHNSON | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I.  INTRODUCTION**

On August 26, 2009, Nicademus Johnson ("Johnson") filed a motion to suppress all

evidence seized and all statements made during an allegedly unconstitutional search and

seizure of his car on April 5, 2008.  (Doc. # 13).  Johnson first asserts that the officers did

not have a legally permissible reason to stop his car.  Next, relying on *Arizona v. Gant*, 129

S.Ct. 1710, 2009 WL 1045962 (April 21, 2009) (No. 07-542), Johnson argues that Troy

Police Officers Anthony McLendon and ("McLendon ") and Bryan Weed ("Weed") did not

have the authority to search his vehicle because he was secured in the patrol car and unable

to access the car.  Finally, Johnson argues that he did not knowingly and voluntarily waive

his right to remain silent when he was questioned.

The court held evidentiary hearings on the defendant's motion to suppress on

December 7, 2009 and March 5, 2010.  Based on the evidence presented during the hearings,

the court concludes that the motion to suppress is due to be denied.

## II. FACTS

It was a dark and stormy night on April 5, 2008. (Evid. Hr'g Tr. Vol. I at 7). At approximately 2:00 a.m, McLendon was on patrol in a marked police car when he received a call from dispatch that suspect Johnny Fenn was at a residence on County Road 3304. (*Id*. at 5 & 7). McLendon had a felony warrant for Fenn's arrest.[1] (*Id*. at 5). When McLendon arrived at the residence, a vehicle was leaving the residence. (*Id*. at 8). Dispatch reported to McLendon that Fenn was leaving the residence in the vehicle.[2] (*Id*. at 8-9). McLendon turned around, called for back up and began following the car. (*Id*. at 9). McLendon activated his lights to pull the car over as the vehicle approached a stop sign. (*Id*. at 10). The driver of the vehicle did not stop at the stop sign but did stop a short while later. (*Id*.)

Once the vehicle stopped, McLendon and another officer approached the passenger side of the car. (*Id*. at 11). By shining his flashlight into the vehicle, McLendon was able to identify Fenn as the passenger in the car. (*Id*.). McLendon ordered Fenn to step out of the car. (*Id*.) Fenn refused. (*Id*.). McLendon opened the passenger door and again asked Fenn to step out of the car. (*Id*.). Fenn again refused. (*Id*.). McLendon then "reached in, grabbed him from the back of the shirt, [and] pulled him out of the passenger's side door on to the ground." (*Id*. at 12). Once Fenn was on the ground, McLendon handcuffed him. (*Id*.)

McLendon asked Johnson, as the driver of the car, to put the car in park and turn off

---

[1] Fenn was wanted for theft of property in the first degree. (Evid. Hr'g Tr. Vol. I at 8).

[2] Dispatch was on the phone with the person who lived at the residence who reported that Fenn was there but leaving in the vehicle. (*Id*. at 9).

the engine.  (*Id.*).  McLendon noticed that Johnson was "kind of fidgety or nervous."  (*Id.*)
Because he "could smell the smell of marijuana coming from the vehicle," McLendon
directed the other officer on the scene to detain Johnson.  (*Id.* at 13).  Officer Phillips placed
Johnson in the back of his vehicle, while McLendon placed Fenn in his vehicle  (*Id.* at 14).

After Johnson and Fenn were secure in the back of police cars, based on the smell of
marijuana, McLendon searched the car.  (*Id.* at 14.)  In the trunk of the car, McLendon found
a black bag which was open.  (*Id.*).  McLendon "could see that it had a piece of a plastic bag
hanging out, and it was open about three-quarters of an inch and [he] could see the green
plant material in there."  (*Id.* at 15).  McLendon took the bag from the trunk to inventory it.
(*Id.*)  The bag contained clear plastic bags containing 87 grams of marijuana[3] and a gun.  (*Id.*)

## III.  DISCUSSION

The issues before the court relate both to the initial traffic stop and subsequent search
of Johnson's vehicle.  The court will address each issue seriatim.

### A.  Validity of Traffic Stop

The Fourth Amendment protects individuals from "unreasonable searches and
seizures" by government officials, and its protections extend to "brief investigatory stops of
persons or vehicles."  *United States v. Arvizu*, 534 U.S. 266, 273 (2002).  Absent probable
cause, law enforcement officials may briefly detain a person as part of an investigatory stop
if they have a reasonable, articulable suspicion based on objective facts that the person has

---

[3]  Dr. Doty testified about the amount of marijuana at the second evidentiary hearing.  (Evid. Hr'g
Tr., Vol. II, at 43).

engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1220 (11th Cir. 1993). *See United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001) ("Because a routine traffic stop is only a limited form or seizure, it is more analogous to an investigative detention than a custodial arrest. . . . Therefore, we analyze the legality of these stops under the standard articulated in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).") (citations in original omitted).

For brief investigatory stops, the Fourth Amendment is satisfied "when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *United States v. Gordon*, 231 F.3d 750, 754 (11th Cir. 2000) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). When determining whether reasonable suspicion exists, courts must consider the totality of the circumstances to determine whether the police officer had a "particularized and objective basis" for suspected legal wrongdoing. *Arvizu*, 534 U.S. at 273 (citation omitted). In so doing, "the reviewing court must give due weight to the police officer's experience." *United States v. Briggman*, 931 F.2d 705, 709 (11th Cir. 1991). The reasonable suspicion required for a *Terry* stop is more than a hunch, and considering the totality of the circumstances, must be supported by some minimal level of objective justification that the person engaged in unlawful conduct. *United States v. Sokolow*, 490 U.S. 1, 7-8 (1989)*; Diaz-Lizaraza,* 981 F.2d at 1221.

Officer McLendon initiated the traffic stop based on information that Fenn was in the vehicle and knowing that there was a felony arrest warrant for him. "[A]n officer may stop

and question a person if there are reasonable grounds to believe that person is wanted for past criminal conduct." *United States v. Cortez*, 449 U.S. 411, 417 fn. 2 (1981). *See also United States v. Roper*, 702 F.2d 984 (11th Cir. 1983); *United States v. Aldridge*, 719 F.2d 368 (11th Cir. 1983); *United States v. Cotton*, 721 F.2d 350 (11th Cir. 1983). McLendon was initially informed by dispatch that Fenn was at a specific residence. (Evid. Hr'g Tr. Vol. I at 7-8). When McLendon arrived at the residence, dispatch notified him that Fenn was leaving the residence in a vehicle. (*Id.* at 8). Dispatch informed McLendon that the information was coming from a witness in the residence. (*Id.*) Fenn was known to McLendon. McLendon confirmed that there was a felony warrant for Fenn's arrest for theft of property in the first degree. (*Id.*) This information was sufficient to give rise to a reasonable suspicion that a passenger in the vehicle may have engaged in criminal activity.[4] Based on the objective facts, the court concludes that the initial stop of the vehicle was not in violation of the Fourth Amendment.

---

[4] The court notes that, although McLendon did not stop Johnson for a traffic violation, McLendon could have stopped Johnson for failing to stop at the stop sign. "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren,* 517 U.S. at 810. *See also*, *United States v. Pruitt,* 174 F.3d 1215, 1217 n. 1 (11th Cir. 1999) ("We agree that, because Pena was speeding, and a traffic violation had thus occurred, probable cause existed for the stop. Accordingly, the stop was reasonable for purposes of the Fourth Amendment, and withstands review."). A police officer "may stop a vehicle when there is probable cause to believe that the driver is violating any one of the multitude of applicable traffic . . . regulations relating to the operation of motor vehicles." *United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998) (quoting *United States v. Strickland*, 902 F.2d 937, 940 (11th Cir. 1990)). When Johnson failed to stop at the stop sign, McLendon had probable cause to believe that Johnson had committed a traffic violation. Accordingly, the court concludes that a reasonable officer in McLendon's position could have stopped the defendant's vehicle for failing to stop at the stop sign, and, therefore, McLendon had probable cause to stop Johnson.

## B.  Probable Cause to Search

McLendon testified that when he reached into the car to get Fenn, he smelled the odor of raw marijuana emanating from the car.  (Evid. Hr'g Tr. Vol. I  at 13, 17, 28, 35).  He immediately gave another officer the police code for narcotics and asked the officer to secure Johnson.  After lawfully stopping the defendant and the vehicle, McLendon then had the duty to investigate suspicious circumstances.[5]  *United States v. Simmons*, 172 F.3d 775, 779 (11th Cir. 1999).  The law in this circuit is clear "that the recognizable smell of marijuana gives rise to probable cause supporting a warrantless search."  *United States v. Lueck*, 678 F.2d 895, 903 (11th Cir. 1982).  *See also United States v. Tobin*, 923 F.2d 1506, 1512 (11th Cir. 1991) ("[A]gent's suspicions rose to the level of probable cause, when, as the door stood open, he detected what he knew from his law enforcement experience to be the odor of marijuana."); *United States v. Salley*, 341 Fed. Appx. 498, 500 fn. 2 (11th Cir. 2009) ("This Court has found that the smell of marijuana satisfied the higher "probable cause" standard."); *United States v Hamilton*, 299 Fed. Appx. 878, 882 (11th Cir. 2008) ("We have held that "the recognizable smell of marijuana gives rise to probable cause supporting a warrantless search.").  Consequently, as soon as he smelled the strong odor of marijuana coming from the car, McLendon had probable cause to search the car.  When McLendon discovered the drugs and gun in the vehicle, he then had probable cause to arrest Johnson.

---

[5]  McLendon also testified that Johnson appeared "real fidgety and nervous."  (Evid. Hr'g Tr. Vol. I at 13). "[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion."  *Wardlow*, 528 U.S. at 124.

McLendon testified that he could smell marijuana coming from the vehicle when he reached into the passenger's door to get Fenn. When he reached in the car and first smelled the marijuana, none of the windows of the car were down, and only the passenger side door was open. (Evid. Hr'g Tr. Vol. I at 18). He testified that he smelled raw marijuana, not burnt marijuana, in the car. (*Id*. at 17). Based on his training and experience as a police officer, he testified that he could tell the difference between the smell of raw and burnt marijuana. (*Id*. at 17). He further testified that the smell was stronger "around the back seat area," and "towards the back of the vehicle." (*Id*.) When McLendon opened the trunk of the car, he smelled marijuana and saw an open, black nylon bag containing plastic bags and marijuana.[6] (*Id*. at 17, 63). Some of the plastic bags were loosely tied shut. (*Id*. at 42-43). The court has carefully considered McLendon's demeanor during his testimony and concludes that his testimony was credible.

Johnson argues that McLendon's testimony regarding smelling marijuana in the car should not be believed, and he presented expert testimony by Dr. Richard Doty to suggest that McLendon's testimony was not credible. Dr. Doty is the Director of the Smell and Taste Center at the University of Pennsylvania. He is also a professor in the department of otorhinolaryngology. (Evid. Hr'g Tr., Vol. II, at 12). Dr. Doty testified as an expert in the field of "sense of smell." (*Id*. at 19). According to Dr. Doty, based on the weather conditions and manner in which the marijuana was packaged in the trunk, it would be "next

---

[6] McLendon described the bags as sandwich bags. (Evid. Hr'g Tr. Vol. I at 58-59).

to impossible" for Officer McLendon to smell the marijuana. (*Id*. at 43). Dr. Doty conceded that he did not know the strength or potency of the marijuana on the night McLendon smelled it in the car, (*Id*. at 46), nor does he know whether the car had contained any other marijuana beyond that which was found in the trunk. (*Id*. at 57-58).

It was Dr. Doty's opinion, based solely on the amount of marijuana found in the trunk, that McLendon could not have perceived the smell of marijuana from the passenger side door. (*Id*. at 63). Dr. Doty was not at the scene, and his opinions appear to be based solely on the amount of marijuana *seized* from the trunk. Aside from the lack of facts mentioned above, there are a multitude of possible scenarios which bear on the question of whether it is possible for an officer to smell raw marijuana. For example, the evidence does not show whether any other marijuana had ever been in the trunk or the interior of the car nor was evidence presented as to the amount of time the marijuana had been in the trunk. Dr. Doty's own testimony shows that various factors might have affected the ability of McLendon to smell marijuana. However, there is a paucity of evidence about any of those salient facts. Dr. Doty's opinion, therefore, is entitled to little weight because he did not know these facts or assess how they might impact his conclusion. Without considering those factors, Dr. Doty's opinion testimony is simply speculative. Relevant testimony from a qualified expert should be considered only if the expert knows of facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation. *Jones v. Otis Elevator Co.,* 861 F.2d 655, 662 (11th Cir. 1988). Dr. Doty's own testimony shows he did

not know those facts.  Expert testimony is not admissible merely to advance a "plausible" theory.  *United States v. Howard,* 855 F.2d 832, 837 (11th Cir. 1988).

During the hearing and without objection, the defendant introduced into evidence an article, Richard L. Doty, Thomas Wudarski, David A. Marshall and Lloyd Hasting, *Marijuana Odor Perception: Studies Modeled From Probable Cause Cases*, 28 LAW AND HUMAN BEHAVIOR, No. 2, 223 (2004), in which the authors recount an experiment about the ability of humans to smell from a vehicle's passenger compartment packaged marijuana located in the vehicle's trunk.  The results of this test showed that the number of false positive reports was essentially the same as the number of correct positive reports.  In other words, the probability of a correct positive was no greater than chance.  During the hearing, the court inquired of Dr. Doty about the reliability of these results given the small sample size (nine people).  In response Dr. Doty said, "Although it's a small sample, all science is based upon relatively small sample; and presumable, if you double the sample or triple the sample, you'll see the same thing, but there's no way of proving that without doing that." (Evid. Hr'g Tr. Vol. II at 35-36).   In the article cited above, Dr. Doty and the other researchers write

> However, these experiments are potentially limited to the rather specific conditions under which they were performed, and by the relatively small number of participants tested.  Thus, their findings need not necessarily generalize to other, even seeming similar, situations.

Doty, *et al*, *supra,* Def's Ex. 22 at 23-32.

Interestingly, during the hearing, as Dr. Doty explained the neurochemical process

about how smell works, he used the phrase  "psychological perception of smell" (Evid. Hr'g Tr. Vol. II at 22), which, he explained, "is . . . our perception of a smell is really a psychological event . . .  The odor is what we perceive, what our brain perceives, and that's I consider the psychological perception."

In *Brinegar v. United States,* 338 U.S. 160, 176 (1949), the Court said, "Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability." *See also Illinois v. Rodriguez*, 497 U.S. 177, 185-86 (1990).  In short, it has long been the law that negligent or innocent mistakes do not violate the Fourth Amendment. *See Franks v. Delaware*, 438 U.S. 154, 171 (1978); *Maryland v. Garrison*, 480 U.S. 79, 87 (1987) (recognizing the "need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants").

Even if the court were to presume that Dr. Doty's opinion about whether Officer McLendon's ability to smell marijuana under the circumstances was correct as a matter of scientific fact, it does not follow that Officer McLendon did not *perceive* the smell of marijuana.  As already noted, the court has found McLendon credible.  Johnson has not shown that McLendon's report of the marijuana smell was intentionally or recklessly false

or made in bad faith.  *See e.g. Franks*, at 171.[7]  Johnson has not adduced any evidence which

casts doubt on the reliability of McLendon's *perception* that he smelled marijuana.  In fact,

Dr. Doty's own study shows that under similar conditions people will truthfully perceive a

smell of something which is not actually present.  Even if McLendon were factually mistaken

about the smell of marijuana, for Fourth Amendment purposes, the lack of evidence showing

that McLendon intentionally, recklessly or in bad faith reported the smell of marijuana is

fatal to Johnson's claim.

### C.  Knowing and Voluntary Statements

Johnson asserts that "due to the late hour, his impaired physical and mental state, and

his low education," his waiver of his rights was not knowing and voluntary.  (Mot. to

Suppress, doc. # 13, at p. 6, ¶ 23).  This claim borders on the frivolous.  It is well-established

that the government "may not use statements, whether exculpatory or inculpatory, stemming

from custodial interrogation of the defendant unless it demonstrates the use of procedural

safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*,

384 U.S. 436, 444 (1966).  In *Miranda v. Arizona*, the Court held that a person questioned

by law enforcement officials after being "taken into custody or otherwise deprived of his

freedom of action in any significant way" must first "be warned that he has the right to

remain silent, that any statement he does make may be used as evidence against him, and that

---

[7] *Franks v. Delaware*, 438 U.S. 154 (1978) deals with the question of false statements in affidavits filed to secure issuance of a warrant.  The affidavits are necessary to establish probable cause.  Here, the probable cause necessary to support the search was the officer's belief that he smelled marijuana.  Thus, the *Franks* standard is appropriate to use.

he has a right to the presence of an attorney."  384 U.S. 436, 444 (1966). Therefore, under *Miranda*, the admission of statements taken during a custodial interrogation conducted outside the presence of a suspect's attorney is conditioned on the Government's ability to show "that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." 384 U.S. at 475.

In this case, no evidence supports a conclusion that law enforcement officials coerced Johnson into giving a statement.  There is no evidence, and Johnson offers none, of coercion. "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).  Absent allegations of coercive police tactics to obtain a statement, a confession will not be deemed involuntary. *Connelly*, 479 U.S. at 167; *U.S. v. Scheigert*, 809 F.2d 1532, 1533 (11th Cir. 1987).  McLendon did not subject Johnson to an interrogation of "exhaustingly long duration." *Miller v. Dugger*, 838 F.2d 1530, 1537 (11th Cir. 1988).  In addition, Johnson does not allege that law enforcement officials applied physical force or threatened to do so.  Nor is there any suggestion that law enforcement officers made any promises of reward to induce Johnson's statement.

In his motion to suppress, Johnson claims that his statements were not voluntary because he was impaired.  (Mot. to Suppress, doc. 13 at p.6, ¶ 23).  Beyond this conclusory statement, Johnson points to no evidence to suggest that he was impaired.  The government, however, presented credible evidence that Johnson was informed of, and voluntarily waived,

his *Miranda* rights.  At the evidentiary hearing, McLendon testified that Johnson was polite, expressed his understanding of his *Miranda* rights, and agreed to speak to McLendon.  (Evid. Hr'g Tr. Vol. I at 16 & 32).  Johnson did not appear to be intoxicated or otherwise impaired. (*Id*. at 32).  There is simply no evidence that Johnson was impaired when he waived his right to remain silent.  This court therefore concludes that Johnson's waiver of his right was voluntary.  Based on the foregoing, the court concludes that the Government has established that Johnson was advised of his *Miranda* rights and voluntarily, knowingly, and intelligently waived those rights prior to the interrogation.[8]

## CONCLUSION

For the reasons as stated, the court finds that the defendant's rights secured by the Fourth Amendment were not violated.  Accordingly, it is the RECOMMENDATION of the Magistrate Judge that the defendant's motion to suppress be denied.  It is further

ORDERED that the parties shall file any objections to the said Recommendation on or before **May 20, 2010.**  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party objects.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a de novo determination by the District

---

[8] The defendant does not suggest, and the record is devoid of, any evidence that Johnson was lacking in sufficient intelligence to understand the consequences of waiving his right to counsel.

13

Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 7th day of May, 2010.


_____/s/Charles S. Coody_____
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE